23-1042 Edda, FERC Marketing and Supply Company Petitioner v. Federal Energy Regulatory Commission on United States of America. Mr. Wagner for the Petitioner, Mr. Eddiger for the Respondent, Ms. Kohlhausen for the Intervener. Good morning. Good morning. Edda, may it please the Court. FERC set the OZARC application for hearing to give OZARC an opportunity to demonstrate that it lacks the ability to exercise market power in an appropriately defined destination market. The ALJ assembled a substantial record and conducted a lengthy hearing. FERC's expert trial staff analyzed the options available to OZARC's shippers. It considered a competitive price for transportation to Wood River. It delivered prices of crude oil by various transportation routes, the identity of the shippers and where they consume crude oil, and the fact that OZARC's largest shipper by volume is its affiliate, and concluded that if OZARC attempted to exercise market power, its shippers would not shift their volumes to a location other than Wood River, and therefore that the destination market should be limited to the pipeline's terminus at Wood River. The ALJ agreed that OZARC had failed to meet its burden to establish a broader destination market than Wood River. It found that OZARC had the ability to exercise market power in that Wood River destination market, and she recommended that FERC deny the application. FERC then put that evidence to the side, did a 180-degree turn, and said that no quantitative analysis is needed to identify the destination market in which OZARC faces competition. It found that OZARC's burden of proof was satisfied by the observation that some of OZARC's volumes flow downstream to Patoka and beyond, and on that basis, FERC determined that Patoka must also be part of the destination market, and that every pipeline delivering to Patoka is necessarily a good competitive alternative to OZARC. FERC ultimately found that OZARC does not have the ability to exercise market power over deliveries to the combined Wood River-Patoka market and granted the application. FERC precedent provides that when geographic markets are tested, the pipeline must justify its markets and competitive alternatives based on detailed cost analyses. By detailed cost analyses, FERC is referring to the costs of the pipeline's shippers. For example, in the TE Products case where that… Since TE Products, the Commission has said on numerous occasions that other methodologies can be used. Well, it said that other methodologies than a hypothetical monopolist test may be used, but as far as whether a detailed cost analysis is required, I don't believe FERC has cited a single case, a contested case, in which they have found until now that such an analysis was not needed. The Commission cites several cases… Does that make it wrong? I'm sorry? Does that make it wrong that this is the first time as long as their analysis reasonably captures the relevant economic considerations? I'm sure you disagree with some of that, but if it does, then what would be wrong? If it follows a pattern of decision-making they have done in other cases, not contested ones, what would be arbitrary or capricious about them doing the same here when you have, you know, their track record of what the business is like between Wood River and Patauka and between Wood River and Patauka, and they made this sort of factual findings. Sure. Well, two things. First of all, just about the prior cases, FERC has said that it does not scrutinize uncontested applications. So any principles it might establish in one of those cases or evidence that it accepts in one of those cases doesn't establish principles for contested cases. That's the one case to which you referred, Mike. TE products? No, no. You said there's been one since then. But I mentioned that FERC has said several times numerous different methodologies would be acceptable. I think you said those were in uncontested cases save one. Oh, I think I must have misspoken then. I don't have a case in mind. Let me just clarify for us, please. If, assuming for the moment anyway, that FERC is correct with regards to the geographic market determination, are you separately challenging FERC's determination that Ozark does not have market power within that expanded market? No. If the destination market includes Wood River and Patoka, the HHI does indicate that. But to go back to Judge Millett's question, I think that the relevant commercial realities, which all parties agree that commercial realities are relevant. We don't agree on what those are. Any consideration of commercial realities must include the delivered price. This court has recognized in the mobile decision that delivered price is the real economic concern of shippers. One of the essential questions a shipper would ask when considering an alternative is, how much will it cost? And without doing that, I just don't believe that there's a complete set of relevant commercial realities being examined. Given the first finding that most of the oil that goes into Wood River continues on to Patoka, you don't dispute that fact? We don't dispute that fact that there's very important context to that fact. Okay, but why doesn't that, given that most travels between the two of them, why isn't that a particularly salient fact in defining the relevant destination market as including both Wood River and Patoka? It would be rather artificial to treat it as just Wood River if most is just passing through. Most of it does go through. However, most of what goes through goes through for the pipeline's affiliate. And the pipeline and its affiliate have aligned interests. They've put that in their SEC. That seems to go to the competitiveness issue that you are not contesting. You just told Judge Ginsburg. But as to the destination market, it's the options that customers have. I'm not sure what the affiliation has to do with on that. I understand it's relevant to the competitiveness. Okay. It has to do with the rationality of using Patoka to escape an exercise of market power. If you're not looking at the entire set of the volumes that go through to Patoka as the relevant shippers that react to an exercise of market power, the only shippers that continue through to Patoka that may or may not react to an exercise of market power are those that are not affiliated with the pipeline. You're saying the affiliate would continue to pay a super competitive price because its profitability is upstream to the partnership. That's correct. But the partnership, as far as we know, as far as I can tell, has an affiliate as the general partner. But there are limited partners, correct? Yes, that's correct. Are they affiliates? No. So the general partner has a fiduciary duty to the limited partners not to overpay for self-serving reasons. Yes. However, they have disclosed to those investors, to those non-affiliated investors, that our interests are aligned. And one arm of this combined enterprise is not going to act against an interest of another arm of the enterprise. Where did you say they have disclosed? MPLX. The owner of the pipeline? I said their interests are aligned. Use that word aligned. Their interests are aligned with those of the shipper who has the largest shipper by volume on the pipeline. That doesn't excuse them from, or does it, from their duty to the general partner, to the limited partners. I think you also have to factor in the fact that there is a long-term contract here. That's a completely different point. Correct. I don't believe so. I think that affects the motivations of the shipper. It has a contractual commitment to its affiliate to continue shipping on this pipeline. With regard to purchase? That's correct. Or else it will pay a deficiency fee in order to switch. So not only do they have aligned interests because of their common ownership, which I recognize is not complete, but they also have a financial tie that has cemented that through that contractual commitment with a deficiency fee. I think this actually – How does that go to the question of what the proper destination market is? Just to look at the reality of how this project is moving and the numerous other pipelines that come into Pawtucka. Again, it sounds to me like you're making an argument that Berks should have found a lack of sufficient competitiveness in the Wood River-Pawtucka market, as opposed to that that's not geographically the appropriate destination market. One of the issues here is that – and I recognize the different steps. There's the step in defining the market and the step in defining the competitors. FERC has basically eliminated the step of defining the competitors because it's found that the use of any alternative, regardless of availability, regardless of price, is going to – it shows that that is a good competitive alternative under circumstances of market power. I don't think you can make that leap from current use to what would happen if the pipeline attempted to exercise market power. That's the cellophane fallacy, that prices in a market are assumed to be competitive, and the choices that customers in that market make are assumed to reflect that competition. I think if you only look at a map and you only look at the shipment patterns under current conditions, that doesn't tell FERC what would happen, what would be rational in the exercise of market power. Briefly, there are the three groups of shippers. I think we could set aside the people that stop at Wood River. We've got the affiliate, the lion's share of the capacity. It's not rational for them to shift. So, Ozark is not going to lose volumes to someone delivering to Patoka. Well, first of all, there's a significant minority that aren't so bound, and by significant, they would care that if they were all to go packing and headed to another pipeline, that would have a huge economic impact on MPLX. I don't think that FERC can make that assumption without looking at actual detailed costs. What it's saying is, and I can't say the number because it's under seal, but I would disagree that it's a substantial amount. Those shippers. So, is that, because FERC did undertake competitiveness analysis, and it did address the affiliate status and those implications. You may disagree with those determinations, but again, you focus solely here on what the destination market should be, and that seems to me a narrower question than the role of affiliates in affecting or not the competitiveness of the Patoka, the Rivermen. The destination market analysis is the only place to contest who is a competitor to this pipeline. And what we're supposed to be doing here is to find out, is it rational for shippers to move, and would it be effective for shippers to move? The vast majority of the volumes on this pipeline are not going to move. So, what you've got is a testable proposition. With this percentage, however we characterize it. It was an argument to FERC that even asked the affiliates they would not move. That's correct. And what did FERC say? FERC said most of the volumes go to Patoka. They're 70 miles apart, and they're both near St. Louis. That's all they said. It did talk about the affiliates, and it did not say one. A lot of that goes to competitiveness. But it felt like that there were checks there. I didn't believe that it said that there were checks there. It just said that they would not. They would not have the checks. I'm sorry, I'm mischaracterizing, but not have the passes to cause, to interfere with their ability. The affiliate status was not going to preclude them from affecting why this should be the destination. So, again, it might have some impact over a competitiveness issue, but for purposes of having consumer choices, it rejected the notion that the affiliate status is going to prevent that from happening, and in any event a significant minority would have sufficient weight. That's a factual determination. You can dispute, but I'm not sure what we're supposed to do with that. There's no substantial evidence for that. It's an assumption. It's just a statement that most of the volumes go this way, so that's part of the market. And what we've said is, but you have to look at, will these people move? Will they provide incremental price discipline if the pipeline attempts to exercise market power? And the answer to that, I believe, is no, but I also don't have the burden of proof. Those are needed to show someone is going to shift these volumes to Patoka, and it's going to hurt this pipeline. It's going to stop it from exercising market power. And our immediate response was, well, your affiliate won't do that, and that's, as I said, it's a quantitative issue. It's a testable issue, and they didn't do it. There's no substantial evidence to support that this pipeline would suffer if it raised rates on its affiliate, and there's no substantial evidence that shows that this pipeline would lose any volumes if it raised rates on the small, of small shivers that continue to Patoka and aren't affiliated. That's the crux of the case. That's what's missing substantial evidence. It's just an assertion. They could go over there. That's just a map. That's not— Let me ask you this. Yes. Repeatedly, the commission says we looked at the market realities, and the record contains some confidential business information that I presume is part of the market realities, and just assuming that there's a significant flow of crude in both directions between Patoka and Wood River. Why is that? I think you tried to explain this once. I'll ask you to try again. Why is that not indicative of being in one market? The back-and-forth flow? Sure. For one thing, the flow from Patoka to Wood River is actually quite small. It's actually quite small. It's, I believe—I don't know that I can say the number. It's a single-digit percentage of the refinery's capacity at Wood River. And if Wood River itself is the destination market, that pipeline, that CapWood pipeline that comes from Patoka to Wood River, would be one of the competitive alternatives. But what FERC has done is not only is CapWood that comes in from Patoka a competitive alternative, but everything upstream of it is, too. And that doesn't make any more sense than going to the source of any of the other pipelines that lead in to Patoka or Canada. The upstream of CapWood were large capacities coming in from two or three other pipelines. And so a shipper could—I think your point is a shipper could route the throughput into Patoka through those carriers, is that correct? That's the assertion, yes. And you're saying that's not significant because they can't get to Wood, because there isn't enough capacity to take them to Wood River? I'm saying there is some capacity there. It's not very significant. And the way that should be treated is to treat the CapWood pipeline from Patoka to Wood River as a competitive alternative, not to look upstream of it any more than you look upstream of the other competitive alternatives. We don't— Well, as you were suggesting, it's a bottleneck on the way to Wood River. That's one way of putting it, yes. And I don't remember, did the commission take account of the possibility of shipping beyond Patoka not to Wood River? Yes, I think so. In a narrative sense, they took account of that. They described it. They didn't do any quantitative analysis. But, yes, those small shippers that continue on to Patoka, as far as I'm aware, no one stops at Patoka. You continue on to Ohio and Illinois and other refineries in that direction. So they could get to Patoka and then beyond, assuming there's capacity on most of the carriers. That is one of the assumptions that Rick made, assuming there's capacity. That's right. Am I correct in recalling that in a market that doesn't have a high HHI, they don't get to the question of capacity? They—there are a couple different ways to look at capacity. Yeah, they don't look at— you can look at capacity as a sort of secondary factor if it's a close case, but you should also look at availability. But that implies that they don't look at it then if it's not a close case. But they're supposed to, because a competitive alternative is one which is readily available. So you're saying they should be dealing with it twice? They should consider whether there is available capacity in order to name something, to designate something as an alternative or a location as part of the market. And then if at the end of that you do an HHI and it comes out on a knife's edge, a 2499, then you can look at it and FERC can make some sort of qualitative judgments and say, okay, this falls on this side of the line or that side of the line. It's relevant to both inquiries. You're not a competitor unless you're readily available. And that sort of fact can be taken into account in the end as sort of a tiebreaker. So you're saying they say they're looking to where a shipper could turn and ignoring that there may not be sufficient capacity to turn there? Not just ignoring, but the pipeline had the burden of proof to show that and FERC let them off without doing so. We do have some data in the record about excess capacity. I don't remember. Is this confidential? Most likely it is. I would say, however, that there's plenty of data in the record, but there's no data in the decision. Well, I think what happened there, it looks pretty likely that the FERC was omitting references to or trying to work around a lot of confidential business information by saying repeatedly we've looked at the market realities, i.e., what's moving around where, some of which is now before us in the green brief. It's in the record, and the FERC says that's what we looked at. I don't know why we would doubt it. I think if they'd done that, there would be at least a citation to an exhibit or something in the record. I can understand that maybe we don't want to litter the brief or litter the decision with confidential markings and redactions and so on, but they should at least have looked at this here, and we all know what that means. They didn't say that. All they said was it's enough to know that the majority, including the affiliate, continue to Patoka. It's about 70 miles apart, and they're both near St. Louis. That's the justification for the decision. There may be plenty of evidence. It's not just the affiliate. One of your clients, all of their oil moves. That's right. All of it. Yes, and I would point to— This isn't just an affiliate movement. That's right. My client is an extremely small shipment from this pipeline. I'm just saying, one of them moves all of their oil onto Patoka. That's right. This is affiliate. But it's about—it's not about all of our oil. It's about how much oil on—how much business is the pipeline going to lose? So how much—the rough percentage, if you can, is very— Low single digits. Just by the non-affiliate that is your client? Pardon me. Low single digits, and I have it in the record. What are you measuring with the low single digits? The capacity, the used capacity on the Ozark pipeline. Beginning from Oklahoma to Patoka, or are you talking just from Wood River to Patoka? I'm talking—well, that's a different pipeline. I'm talking from Cushing, Oklahoma to Wood River, which is the Ozark pipeline, one on, one off. Okay, between Wood River and Patoka? I don't have that data. I'm sorry. I do have the data in the record. There it is. Joint Appendix 1278, lines 12 to 16, that discusses Husky's share of the Ozark capacity. I'm sorry, but is it— What was the reference? Yes, Joint Appendix 1278. It should be in the sealed appendix. All right, and this is from—on which segment? This is the Ozark segment, so this is Oklahoma to Wood River. Right, but I'm not quite sure. It's a reference— The percentage between—since all of that moves on, how much of—not all of the affiliate stuff moves on. How much percentile is between Wood River and Patoka? I don't, but I— All your—all non—I should not—all non-affiliate shippers. I have that number in the brief as well.  Okay. Could you tell us when your rebuttal time is? Yeah, it's in my brief. Let me find the number. Do you have a rebuttal if you wish? I'd be happy to. Why don't I now take the time and I'll state that on rebuttal. Well, the last thing I would just say about—pardon me. Just sum up then, and we'll give you some time on rebuttal. I appreciate that. Yeah, the last thing I would say about Husky's volumes—all of Husky's volumes. I mean, that's like saying a grocery store doesn't have market power over its customers because the Jones family shop buys all their groceries there. It's a matter of what is the share of the pipeline's capacity. What's it going to lose? What does it put at risk by raising its prices to a super competitive level? And what it puts at risk is very little. It puts at risk that small percentage of people that aren't affiliated with it that are going to go through. This all sounds, again, like a competition argument, not a destination market. I understand that. And the destination market— It did talk, actually, with some specificity in paragraph 27 of the initial decision about the constraints it thought would exist—that it found would exist on MPXL's ability to unfairly raise or exercise market power and increasing rates. So it did address that issue.  We haven't before considered affiliation as part of identifying the destination market. Customers as customers, I guess, is what they're saying there. And then we'll deal with affiliation and the competitiveness. And I don't understand your briefs to be saying that was an error of law by FERC. You have lots of arguments about the substantiality of evidence supporting their ultimate determination of the destination market. You have an argument, as a matter of law, that FERC was wrong to say we don't—we haven't in the past considered affiliation just at this question of the destination market. It's ruled on a small handful of contested market-based rate cases. It's not surprising that any particular set of— You're not saying they erred in saying— No, I'm not saying— We're putting affiliation in the competition, but not in the destination market. You agree that's not an error of law by FERC? Or you're not contesting that? I'm not contesting that. What I'm contesting is that in order to have substantial evidence for their destination market, they needed to account for it. Well over my time, I appreciate that. We'll give some time, everybody. Thank you so much. Maybe you'll have that information for Judge Ginsburg. May it please the Court. I'm Scott Edgar for the Federal Energy Regulatory Commission. Thank you for hearing this case this morning. I want to go directly to the discussion, Judge Millett, on some of the affiliate issues and some of the paragraphs that the Court was referring to, and in particular the initial decision, paragraphs 25 through 27, where the Commission, in fact, addressed affiliate issues when it comes to determining the geographic destination market. The Commission's basic analysis is in the earlier paragraphs of the order, 18 to 22, where it relied heavily on the market behavior, and we can talk about that. But what I want to focus on now is what paragraphs 25 through 27 are doing. This is where the Commission took a very careful look at the assertions by petitioners here, Husky and Phillips 66, that the affiliate would prevent acting as a discipline on potential exercise of market power by MPLX Ozark. Would you like a JA reference on that? Yes, Your Honor. I'm looking at paragraphs 25 that starts at JA 779, and in particular the following paragraph that starts at JA 780. What I want to highlight is the footnote to the first of those two paragraphs. Footnote 61, JA 780. Here, the Commission is citing to the rebuttal testimony of witness Dr. Webb, and using what he labeled as a conservative elasticity, determined that the non-affiliates would cause losses if there was an exercise of market power here. I can point to the specific number. Again, I want to be careful not to discuss sealed material, but his exhibit that he was referring to is at JA 1391. Is that the footnote you're referring to? The footnote I'm referring to is in the Commission order, paragraph 25, note 61. This is the reference to Dr. Webb. This is in support of the Commission's determination that the significant minority of non-affiliate shippers would help to discipline an exercise of market power. I just want to point out two things about what Dr. Webb says that the Commission is referring to right there. I already mentioned the conservative elasticity. He also assumes in that analysis that Phillips 66 has no response, no discipline whatsoever, and he also assumes that the affiliate shippers have no discipline whatsoever. That's an interesting point, because if we look at the next footnote, the Commission cites a cross-examination of Dr. Norman, where Dr. Norman says that it's not that the affiliate shipper would have no incentive. The affiliate shipper would have a reduced incentive. It just seems to me like these two paragraphs in the footnotes you're talking about are first saying why trial staff was wrong. Okay, but to have substantial evidence, they have to show what's right. Correct. They can't just say you're wrong. I agree. Where do they have substantial evidence that there's not going to be this affiliate problem, that there really will be customers with a choice in the Pawtucket market, which is their argument that there really can't be an apparition given their affiliate status, that there's going to be any real choices made? The analysis that I see in 27 is really more about the switch from the MPLX line, I think I've been saying that wrong, but MPLX line to the Woodpat pipeline, changing between the two lines and charges there, which seems to be potentially different from the ability, the price is actually charged then to everybody who's going to travel down these lines, and in particular, over the long term, to be able to essentially make the affiliates not relevant customers for purposes of this destination market. So now backing up into the commission's primary analysis, so these are paragraphs 18 through 22, and what the commission there was saying that there are alternatives, so the alternatives available are the ones that are available in Pawtucket, so we don't have to assume... You were right, they didn't talk about affiliates, at least I haven't, until paragraph 25. That's correct. Okay, so but before that, they're saying there's customers, there are other pipelines in Pawtucket, but we don't know that there's a sufficient number of customers there from the Wood River to Pawtucket link that the people that are going all the way through are going to be able to actually exercise any kind of meaningful check on Ozark slash Woodpat. So there's a possibility to increase prices, exercise market power in a way that would really make this not a matter of customer choice, and I think that's what they're saying when they blend the competition in, is that there really isn't going to be realistically customer choice in Pawtucket in the way that FERC found it, and so where is your evidence that customer choice will be there by a majority of shippers? I guess I would say two things. First of all, to refer back to the footnote that's referring to Dr. Webb's rebuttal testimony, I think he is saying that the non-affiliates alone are sufficient to discipline this market, and the commission cites that in the footnote. But backing up... How can a minority have enough control? Again... There's not a lot of options between Wood River and Pawtucket. There's lots of options in Pawtucket, but there's not a lot between Wood River and Pawtucket. But they don't have to go to Wood River. The problem here is that available options are being ignored by the analysis suggested by my friends on the other side. That's Dakota Access, Southern Access, and the Mustang. They don't go to Wood River. Maybe I'm wrong. Correct me. I thought there was evidence in the record that those pipelines were either at or very close to capacity already. I don't believe that's an issue. I'd go back to the... Is that a factually accurate description of the record or not? I am not sure. I would refer Your Honor to the initial... Maybe they don't have it, or you can provide it later. But if they are at or near capacity, then they're not a real choice. Are they? Or tell me how FERC explained that they would still be a choice, even if they don't have room to add staff for. I think that's a question of whether there are competitive alternatives available. Whether there are alternatives available full stop. The whole premise of picking Pawtucket, as you just said, is that that should be the destination market. Not just because a large percentage of the oil majority is moving from Wood River to Pawtucket. But because by the way they define a destination market, that's where customers are purchasing their oil and where they have choices about purchasing oil. And so I'm testing that part about they have... If they only had one choice of purchasing oil in Pawtucket, it wouldn't be a good destination market. And so they have to have choices. That's how FERC framed the analysis anyhow. Depending very heavily on these choices. But if those choices are fantastic, don't actually exist, then how can... And maybe just I'm wrong about the capacity. But if I'm right about capacity, how can this possibly be a relevant destination market under FERC's own test for what it takes to be a destination market? Your Honor, here I would refer maybe to... We have extensive citations at page 56 of our brief. And I can go through some of those. And it starts with the citation to witness stepsualty at page 11 who talked about the highly... Yeah, I'm sure I'm on the same page. Which JA page? This is cited... I can tell you his testimony is at JA 511. And I can tell you where this is cited in the commission orders, footnotes 42, 55, and 60. This is the original decision? Yes. And he talks about the highly desirable nature of the Patoka hub and that there's infrastructure there for further transport. And he talks about that the significant majority of the volumes on MPLX-HOSAR go to Patoka. So where are... I get the significant... Sorry. Significant majority said there's a significant majority. But certainly the majority of oil is going off from Wood River to Patoka. I get the commission found that. You just mentioned a couple of other things the witness said. Where does FERC adopt, say those same things? I would... Just because FERC cites some witness doesn't mean that everything the witness says is not part of FERC's decision. Yeah. Again, I would cite the footnotes 42, 55, and 60. I know, but where in FERC's decision itself? That is... 42 says the majority of volumes are delivered to Wood River for transport to Patoka. We said that. Okay. And then you said 46? 42, 55. So that's 55? Yeah. Okay. Sorry. Let me just hop in here. This is in the order, right? Right. So 55 is on JA-779. So that's saying the same thing. So twice now we're saying that lots of stuff that goes into Wood River goes on to Patoka. But you were citing testimony for more things. Those things are not things that FERC said. The significant majority of the volumes go to Patoka. Right. That's all you're citing him for? Right. What does that have to do with whether there's actual real-world competition in Patoka on these other pipelines if they're at capacity? I think we have actual shipper behavior. And for that, I would move to the next citation to the record, which here I would cite Dr. Webb. And I'm looking at pages 49 and 51 to 56. Wait, wait, wait. Of the FERC decision? Of his testimony. I want to know where FERC said this. I'm trying to be clear. The fact that a witness says it isn't enough unless FERC adopted that rationale. So where did FERC say what you're about to say? Sure. Notes 42, 45. I don't want to go too fast here. I can read these. No, but 42, I mean, again, they're citing to Webb, but where are they saying what you're saying Webb said? I think the challenge here is that in my notes here, it's in red ink, meaning the citation to Webb is going to be to the sealed version of the JA. And I'm glad to provide that citation to the court. The commission can't say some of these. No, but 42 is a footnote that says, comes after the sentence, the majority of volumes on MPLX go from Wood River to Patoka. If that's all they're citing Webb for, then it's not helpful to you. And if they are citing it for a additional legal proposition or factual finding, they need to make that somewhere. They can do a redacted decision, but I can't, if all that footnote, all that precedes that footnote is the same point that we've made four or five times about the movement, and that they don't contest about the majority of movement of oil from Wood River onto Patoka. No one can test that. And as far as anyone can tell from FERC's decision itself, that's all they're citing. That's Shulte and Webb for. And I don't know how we can then look at all these other pages and bring them in and say FERC was adopting those things if they didn't say it. I do want to make sure I mentioned all the footnotes, and I take your point. I can't change the way the order is written. Do any of the other footnotes come with FERC making any of the substantive analysis that you're saying exciting to you? I would say yes, Your Honor. FERC is looking at the market, and FERC is saying that the behavior of the market participants indicate that the appropriate market includes Patoka. And if I could stick with Dr. Webb for a second, and he discusses at length what the behavior of Pellet 66 is here. And a lot of that information I can't disclose, but it's in the sealed version that the court has. What FERC could say in this decision is we find the behavior of what you just said here in court, of Phillips Petroleum, supports our determination X. Did they say that? I would point to paragraph 20 at J776, and that's where the commission says that the market should include Patoka because it has alternatives available. The commission was right about that, and in support. Right, in the sense that the pipelines are there. The pipelines are there, and? What if there is no capacity? We're not enough. Well, I think I would, again, I would point to Dr. Webb's testimony that I referred to, and that indicates as a practical matter, the capacity is there. How much capacity does there have to be for switchers to exert to make a price increase on profits? I'm not sure I know the answer to that, but again, I would cite what the commission cited here. I would refer to what the commission cited to support that proposition. And that's a footnote 61 that cited Dr. Webb's rebuttal testimony. How much throughput is there now beyond Wood River? Is that confidential? I think the number is confidential. It's a substantial majority that goes to Patoka from Wood River. And what the commission was saying in paragraph 25 is that a significant portion of that. Is it in the record and unredacted how much capacity Capwood has? Not excess, total? I don't have that in front of me. I think it must be in the record. Is Keystone one of the players? I'm sorry, Your Honor? Is Keystone one of the players that could take oil to Patoka? Yes, it is. All right. So it looks like there's it looks like a great deal of uncommitted capacity there. And I would refer, Your Honor. However, if let's assume there is, what do we make of Jeffrey's point that it's not really in play unless the price of crude there is competitive. Right. That the shippers are going to look and aren't going to take advantage of the pipeline's alternative route if they're going to be selling at the other end where the price is not as high. Again, and I would refer to the footnote 19 of the initial order. The competitive alternatives aren't contested here. There's no question that if we limit the geographic market to Wood River, the competitors are Keystone and Platte and Capwood in addition to MPLX Ozark. But if we expand it, then Capwood falls out and Dakota Access, Southern Access and Mustang gets included. And that's why we see the change in nature. I'm sorry, I won't say it out loud because it's in the sealed appendix, but just on 1096 to 1098, we have question, answer, question, answer, question, answer, question, answer. And they're all at or near capacity. I mean, do you have your appendix in front of me? Right. Starting with line 15 on 1096 through line seven on 1098. And they're going through these things and they're at or near capacity. Am I misreading it? I don't think so. Again, I don't think the competitive alternatives are actually disputed here. And that's what the commission is saying in the footnote. Right. So to back up then. So we're not talking about competition, but to say that we're picking Pawtucka as part of the market, not just because of the movement, because that's a place where customers are making choices. If they're not making choices, then how does that make sense? Well, I think they are making choices. And again, that gets back to some of the. Making choices if there's no capacity on the other pipelines. Where they're actually using. I think the behavior of the participants here in market, and that's. I'm very confused. You're saying they're at or near capacity because everyone's already using their things? That could be. Again, I would refer your. We don't know, though. I don't think that was an issue here. The issue here is the second step, whether the competitive alternatives are good and available. I don't think that comes into play here. How does how does. Define what the destination market, how it looks for what an as destination. It looks for where shippers can, where the shippers can ship. The commission discussed that. It can't be just where shippers can ship page at paragraph 19. The destination market, this is 7, 7, 5. Where the shipper may rationally look for transportation. And where the shippers supply downstream needs. And where alternatives may be available if the pipeline attempts to exercise market power. And the commission explained what the analysis here. Rationally look for transportation services. I think that's. For this pipeline that has for their arguments about the affiliate relationships and ability to exercise market power, their arguments. That's a question of whether the alternatives are available and that's, that's the next step. And I think what the commission is saying here is. The next page, the commission also considers whether the appropriate, this is the same paragraph. Top of 776, the commission in identifying the destination market. Not the competition step one. The commission also considers whether the appropriate geographic market definition should be expanded based on where shippers may look for alternatives in the event of a price increase. So, that's part of identifying the destination market. Correct. That's what first said. Yes. Okay. And so that's why I'm asking. And clearly, we're, it's in the record testimony about. Capacities on other pipelines. And so when we're to assume. So, the record were to show that all those other pipelines and talk are already at or near capacity. How would they then? How would their existence support folks determination? That Pataka is a place where shippers may look for alternatives in the event of a price increase. That's where I'm hung up. That's what I'm not understanding. And again, and now we'll get back to Dr. Webb's testimony. I think he explains what, for example, what Phillips could do. And I want to be careful not to use any of the information that's that's field. But this is it. Okay. But we don't have anywhere adopting that. But I can show where they were cited for a different point. I was just for the movement point. I think. Even though the only sentence in the opinion says. Before the footnote says this is to show movement from Wood River to Pataka significant. A majority or most, I think they use different words. Of oil moves from Wood River to Pataka. But no, they cite the two experts. And you're saying when they did that, they were also endorsing everything that Webb said on the side of page. I think that's how we're supposed to interpret that without them having said that. Sorry. You're right. I think what the conclusion here is that the behavior of the shippers demonstrates that this is one market and they cited these pages. And I can, I can show you the footnotes where where Dr. Webb was cited for these propositions because they're moving back and forth. And they have alternatives. Yes, that's what Dr. Webb. Which pages? Yeah. Yeah. And here I'm referring to. Just forty nine and fifty one to fifty six, a twelve, forty seven. And twelve, forty nine to fifty four, twelve, fifty four. And. I'm sorry, your Honor. I've asked a lot of questions of my colleagues, some as well. Any other questions? No. Did you say at some point that Burke said the competitive alternatives uncontested? Am I hearing you correct? The. And if so, where the the. In footnote 19, the parties agree on what the what the competitive alternatives would be. If the if the geographic market and J.A. 770, if the geographic markets confined to Wood River, the competitive alternatives would be keep stone plat top wood. And if it's expanded, the competitive alternatives here pull in. Dakota access, southern access and Mustang and capital would fall out because of the code access that I thought that was contested. So access Mustang. Is there some finding somewhere where Burke says the parties do not contest the idea? I'm referring to footnote 19, J.A. 770. OK. And. Sam, over time, sir. So the statement that that the shipper could simply miss the word here is to simply divert barrels. To Patoka through another carrier. Is made without reference again to the availability of capacity. Correct. That's just the bottom of. That may be true. I don't understand that. That's what I'm not understanding. Green, a competitive alternatives exist. Without the parties thinking about acidity when they made such an agreement, so I'm not sure. We're bringing together what we're talking about in the record parties agreed that there were the first say the parties agreed that there were competitive alternatives available, which to me means capacity would be available. You can't have a competitive alternative. They don't have a capacity, at least not in my mind. That doesn't make sense. Is there such a finding here that there's no disagreement? On the point that I asked, and Judge Ginsburg just asked, in other words, was there some disagreement over capacity somewhere? Not that I'm aware of. I think that the way that the commission's analysis here is to look at these markets and look at the market behavior. And I can go through this, the big colloquy of I had with judgment about some of that behavior of Phillips, 66. And I can cite that as well. That is. The testimony of. The testimony of. Witness Chan at pages two and four, two, sixty seven and two, sixty nine. That's not healed. No. And that's the testimony there is that. All of Husky's volumes are shipped to Patoka and then to Lima. And that testimony is that Husky could purchase oil at Patoka or secure transportation on Dakota access, southern access. Or Mustang or Keystone flat. And then made with any reference to capacity or whether Husky had arrangements. I don't believe so. I'm not there. No question. Thank you. Intervener. Cole has said that correctly. Morning, Nancy, the court, I'm Elizabeth Cole has been on behalf of the intervener. Hi, everyone. My name is Elizabeth Cole. I'm on behalf of MPLX pipeline. I want to start today by going back to a discussion that judge Ginsburg had about whether the commission had ever defined the market in this way. And I would point you to. The case enterprise product company, it's often referred to as the way one. It's at 146, 61, 1, 1, 5. And it's referenced in footnote. 35 of the commission's ID. Are the commission's decision. This is the case that underlie. The court's decision and mobile before this court, and I'm just reading from this decision. It was a contested market. And in that market, it's a trial staff using actual operational data from the pipeline trace, the crude oil that Pegasus received. Backwards to its injection point to identify all potential alternatives. To Pegasus. That's paragraph 35 of this order. It's cited in footnote 41 of the commission's decision. So the commission has, in fact. Undertaken exactly the same analysis to define the market. In this case, it undertook it previously. In the Pegasus decision. And finally, I would don't have much time, but I would like to discuss the fact that. The issue that was presented to the commission on brief. And here regards the determination of the geographic destination market. There's been a lot of discussion about whether alternatives are good alternatives. Whether they're used, there's not a lot of discussion about that in the court's decision. I mean, in the commission's decision, frankly, because that wasn't a topic that was contested. That's not 19 shows. I understand that. The question about how is an alternative a good alternative if it doesn't have any capacity. That's been discussed extensively by the commission before in other cases. It wasn't discussed here. And unfortunately, I don't have the site here. The idea is that someone could buy the cruise after it shipped on 1 of those alternatives. So, it doesn't have to be possible that the current carriers have already provisional rights on other carriers. Yes, that's also the case. If you look at. Figures 2 and 3 and our brief, the interveners brief, I'll give you the joint site. These show the significant. It's a 1251 for figure 3, 1252 for figure 2. These are highly confidential exhibits, but 1 shows the movement of the petitioner itself right now. In the market, in which of the pipelines, this is figure 3, which of the pipelines that already uses. So, this is evidence that regardless, I think this is why this wasn't contested because there's actual use of these. By petitioners right now, and the commission could see this as could everyone else. What needs to be shown is that at least the majority, not all non affiliate shippers. We'll have access to these other pipelines if they have to take. All all their oil off. And P. L. S. slash would Pat due to. Super competitive increase in prices. Nothing in the past, they've been doing it when would pattern when when. There's already just a filed rate in place. So then they wouldn't be. Looking for capacity or using capacity as a protective measure. Against that, right? Well, the question is whether it's a protection against. Opening opening up to do ability to use. Market rates, and then theoretically, and I'm not accusing anybody of anything, but theoretically. To using imposing super competitive prices. We don't is that here? And I take your point. I mean, first is they appear. To agree, and so it's not sure what it means to appear to agree to something. It seems to me they appear to agree. These are things these are options they have right now. And I'm asking about a different world. They have capacity right now when there's no reason for them to jump off. I guess I would respond in 2 ways to your question. 1st, that. The analysis that the commission conducted. To support its decision that these markets were competitive. It considers these alternatives and. I think that was, although you may not see it exactly in 19. Everyone included the same competitive alternative in those analyses. This was not an issue. You didn't have petitioners arguing. There's no capacity for this 1 should be excluded. It just wasn't before the commission. Also, I do think it's important that it's. It is not the way that I think about it is. Not that it has to be an exact that shipper can move. But it can buy the oil in Patoka, but another shipper moves down those lines. And I think if, again, it's not in the decision. We're shipping oil. Yeah, just they're not just purchasers. That's correct. If you look at the statement that Mr. Chan made, he has testified on behalf of the petitioners. I'll be back to that page again. Please. Sorry. Yeah, sure. It's in footnote 43. I don't have the right in front of me for it. Mr. Chan was asked in his testimony. What are your alternatives? They asked him, he said, buying crude oil in Patoka. Which demonstrates the point I was making shipping crude oil. To Patoka, meaning he recognizes there's other pipelines. He listed them. Or shipping to wood river on a different pipeline than Ozarks. And then shipping that question was asked. What are your options? If. Super competitive prices imposed by. I believe the exact wording is, if you don't use the applicant pipeline. What would be your alternative? And they listed buying. In Patoka shipping in Patoka and shipping to wood river and over there was petitioners. That's correct. And so I think. I agree. It is hard to point in here to some of these questions you're raising, but I think that's because that wasn't what was before the commission. I believe I'm over my time. Thank you very much. Thank you. Mr. Wagner will give you 3 minutes. Thank you. Thank you to look at page 1254, please. The answer line 9. Part of which is confidential. Goes to the 1 of the points we've been discussing is that. Is that statement accurate? But 1 of your 1 of your clients. This is a statement by Dr. web. This is the pipelines witness testimony on 1254. Right. Oh, I'm sorry. Is it accurate? Is it accurate? No. Outside of the. Confidential material. And so, thereby defeating the coordinated price increase. And that's not accurate. That's not proven. And that's what's needed. Well, I'm asking about the phrase that is confidential. Is it accurate regarding rights? Yeah. I believe it does have those long term contracts. Yes. Thank you. 1 thing I'd like to very quickly go back to and. Respondents discussion is the citation to Dr. web's testimony. At paragraph 25 note 61 of the commission's decision. On page 55 of perks brief. They expressly disavow relying on that. It states that. They looked at commercial reality. Not Dr. web's quantitative analysis. So, to the extent that they're relying on that to sort of backfill missing. Substantial evidence that they've expressly disavowed relying. So, are they missing substantial evidence? Did you raise the. Capacity issue is just very confusing record. It's not so much the capacity issue. You didn't argue that there's no real choices and because of capacity constraints, or at least for a lot of the shippers, maybe not 1, but maybe for a lot of the shippers, not affiliate shippers. There's capacity constraints. You haven't raised that. We raised that. There are not delivered price that the delivered prices are such. That you would not shift to any option at the token. Not because of lack of capacity, but because of the destination market price. That's correct. So that must be tested. You have to look at the delivered price. What has said is we assume that these are currently used. There's a map showing flows because these are currently used. They're assuming that the price would be such that shippers. Enough shippers to move the needle would respond to a price increase by shifting. That's the fact that's missing. If you don't show that someone would shift to another location, using hard evidence, using actual delivered prices, and it doesn't do you any good to say that under some other set of conditions, people use these pipelines. Is there incremental discipline? The answer is no, and there's nothing in this decision that says that there is. Do you disagree with footnote 19 in the original decision, page 8771, about the existence of competitive alternatives? Oh, the footnote? Kind of a nuanced answer. The ALJ required the parties to provide HHI analyses under various sets of assumptions. And if the destination market is Wood River, and the capacity of X pipeline is this, what's the HHI on what results? And there's a table in the joint appendix showing that. We're not contesting that if the destination market includes Patoka, those are the pipelines that go to Patoka. But you have alternatives. It's difficult to agree with. We would not shift at all to Patoka.  No alternative at Patoka is competitively priced such that we would shift and actually discipline the market, discipline the Ozark pipeline. So that means that no alternative at Patoka, nothing should be looked at. Based on price. Based on price. And FERC makes a really significant error in that regard in all of it. Going back to that Seaway decision where they say, all used alternatives are necessarily competitive. Again, that's the cellophane fallacy. And they've sort of forced the debate into what's the market then. If we're going to assume that everybody in a market is competitive, what's the debate there? Any other questions? No. Thank you very much. Thank you. Case is submitted.
judges: Millett, Edwards, Ginsburg